Submitted on briefs September 18, affirmed November 2, petition for rehearing denied November 28, 1956

## FITTS *v.* HANKS ET UX

303 P. 2d 220

Cecil H. Quesseth and John A. Heltzel, Salem, for appellant.

Williams & Skopil, Salem, for respondent.

TOOZE, J.

This is an action to recover rent pursuant to the terms of a written lease, brought by Robert J. Fitts, as plaintiff, against James Hanks and Helen L. Hanks, as defendants. A verdict was returned and judgment entered in favor of the defendants. Plaintiff appeals.

On October 25, 1950, defendants, as lessees, entered into a lease agreement with Herman Moritz and Myrtle Moritz, as lessors. The lease provides that lessees would rent for a term of four years certain real property which was a part of the Golden Gate Hop Ranch, located near Independence, in Polk county, Oregon, together with certain personal property. The real and personal property were leased primarily for the purpose of growing hops, the first hop crop to be harvested under the lease being that of 1951. Lessees were to pay to the lessors $13,832 per year in advance, $10,000 of which was payable on or before January 2 of each year, and $3,832 of which was payable on or before February 2 of each year. The lease provides,

among other things, that the lessors were to supply defendants with a "complete hop picking machine in good working order and ready for operation," and that "lessees shall have the use of sufficient irrigation equipment at the proper time for the irrigation of his [sic] hop crop." This equipment was vitally important to the successful operation of the leased hop ranch, and in particular, the irrigation equipment.

Defendants grew and harvested hops on the ranch during 1951 and paid the rental for that year. On December 30, 1951, the lessors sold the property to the plaintiff. Defendants abandoned and moved all their machinery and equipment off the leased property some time in late August and September, 1951. They did not pay the 1952 rental due on January 2, 1952, and on February 2, 1952, which rental was for the 1952 operation. It is to recover this 1952 rental that plaintiff brings this action. The lease provides that 30 days after the rent is due and unpaid, the lessors may re-enter upon the property. On February 7, 1952, the plaintiff leased the property to another tenant for a short period of time, and then later leased it to one Lewis P. Doney, who had formerly been the foreman of defendants' operations on the premises.

If plaintiff or the original lessors surrendered the lease, or if defendants were constructively evicted prior to the dates on which the rent would have become due, plaintiff is not entitled to recover the 1952 rental. The pivotal questions raised by this appeal are: (1) whether the answer alleges facts sufficient to raise the defense of constructive eviction and (2) whether there is sufficient evidence upon which the jury could find a constructive eviction.

■ Plaintiff's first assignment of error is that the

court erred in overruling plaintiff's demurrer to defendants' first, further and separate defense. This defense, as set forth in the answer, reads in part:

"II

"That the said Herman Moritz and Myrtle Moritz did not provide suitable irrigation equipment and did not provide a hop picking machine in good working order and therefore damaged the defendants *and made it impossible for them to continue as lessees of the herein described property.*" (Italics ours.)

In *Hotel Marion Co. v. Waters,* 77 Or 426, 433, 150 P 865, with respect to the subject matter of constructive eviction we said:

"As to the permanence of the acts complained of, there is an equally wide divergence of opinion; but we adopt the doctrine expressed by the court in the case of Edmison v. Lowry, 3 S. D. 77, at page 81 (52 N. W. 583, at page 584, 17 L.R.A. 275, at page 278, 44 Am. St. Rep. 774, at page 776), in which the following instruction is approved:

" 'As to the matter of eviction. It is not necessary there should be any act of a permanent character, but any act which has the effect of depriving a tenant of the free enjoyment of the premises, or any part thereof, or any appurtenances pertaining to these premises, must be treated as an eviction, and I charge you that any act of the plaintiffs which has deprived the defendant of the enjoyment of the free right pertaining to and belonging to him as tenant may be treated as an eviction.'

"This doctrine has also been approved by the Supreme Court of Washington in the case of Wusthoff v. Schwarts, 32 Wash. 337 (73 Pac. 407)."

A breach of covenant to supply irrigation equipment might well deprive the tenants of a hop ranch such as that leased to defendants of their free right

to enjoyment of the premises and make it impossible for them to continue as lessees. The allegations of defendants' first, further and separate defense are, therefore, sufficient to raise the defense of constructive eviction. *Title & Trust Co. v. Durkheimer Co.,* 155 Or 427, 450, 63 P2d 209, 64 P2d 834.

■ The second assignment is that the court erred in denying plaintiff's motion for a directed verdict. The plaintiff argues that the evidence is insufficient to sustain a verdict either on the theory of surrender or on the theory of constructive eviction.

We will examine some of the evidence in the record.

Plaintiff's exhibit "7" was a letter of June 29, 1951, sent to the lessors by the defendants' attorney. It read in part as follows:

> "It has come to the attention of my clients, that you are not abiding by that certain lease executed on the 14th day of November, 1950. I particularly refer to condition No. 2, Paragraph D, concerning the use by Mr. and Mrs. Hanks of certain irrigation equipment. This is to inform you that if adequate irrigation equipment is not furnished immediately as called for in the lease, to Mr. and Mrs. Hanks, the lessees, as well as the George Segal Company, will hold you liable for any and all damage that might accrue.
>
> "Within the aforementioned lease under condition No. 2, Paragraph B, might I draw your attention to your covenant that you will provide a hop picking machine in condition to pick hops. According to information given this office the machine intended for said use is not yet in picking condition, although the time for harvesting is but a few weeks away.
>
> "Please consider this a demand that the mentioned conditions of the lease be met on your part; and, realize, if the same are not complied with, that you shall be held liable for all resultant damages."

Lewis Doney, defendants' former foreman and the present lessee of the property under plaintiff, as a witness for plaintiff, testified on cross-examination as follows:

"Q It was over the irrigation system and the pumps that you had the fist encounter with Mr. Moritz?

"A Well, I will tell you. Mr. Moritz was going to use that pump, and we had two operating then, and most of them were haywire, burned up, and I guess Jim went to see him, and he was going to see about getting it, and I went down to get the pump and Herman said he was going to use it, and I went down in the field and jumped on him about the pump and told him we had to have it down in the field, because Jim wanted it, and we got in a big argument then before we ever got in a fist fight, and Herman told me not to take the pump, so I didn't take the pump because I was on Herman's land then in his alfalfa, and Jim came down and said, 'I will go over and see him about the pump.' He told me not to use it because he was going to use it, and I said, 'You better not go over there. He is mad. I already made him mad,' and we just got in a little scuffle there, but we still got the pump.

"Q Was he irrigating the alfalfa at that time, Mr. Doney?

"A No, he was getting ready to irrigate.

"Q He had quite a bit of alfalfa and grain that he had a couple years before?

"A I never seen no grain, just the alfalfa.

"Q But he had alfalfa?

"A Yes.

"Q And there were times when you desperately needed water on the hops?

"A Well, they broke down when Steiners was there, the same way.

"Q You did need water?

"A Well, of course, a person needs water all the time to irrigate down there. We generally irrigated that ranch just two times years ago, and sometimes we only irrigated one time. We irrigated it two times and we ran on it a third time, some of them.

"Q But it was really a very dry year, generally speaking, wasn't it?

"A Yes, it was dry last year, too.

"Q '51?

"A Yes, and dry in '52.''

James Hanks, one of the defendants, testified on direct examination:

"Q Did Mr. Moritz stop your men from using the irrigation equipment on occasion?

"A On occasion, yes, sir, never in my presence, but he did it.

"Q Did the relationships reach somewhat of a climax about the time of the fight between Mr. Doney and Mr. Moritz or not?

"A Yes, sir, I had about six or seven men, including Mr. Doney, and I asked them to have a pump in front of Mr. Moritz's alfalfa field, and they were ordered to have it going at about six o'clock in the morning, and I arrived at about seven, and the men were all standing there and the pump was idle, and it was very essential to get those pumps going, and I said, 'What is the matter,' and Mr. Moritz said, 'Keep your hands off that pump,' and I drove my pickup across the field, and Mr. Doney went across, and, of course, when I spoke to him, he came out of the truck fighting, and we had a fist fight, and we still didn't get the pump.

"Q Was he using the pump at that time?

"A No, sir.

"Q Was he using the pumps at different times when he didn't want you to use them?

"A He had them sitting there. They had to

get the alfalfa off and the bales were laying in the fields, and they were hauling it off in the truck.

"Q Now, the Fuggles—is it not true they will start drying in a short length of time?

"A Yes, in a normal year they would start in June.

"Q But this year it was early?

"A Yes, in April.

"Q Do you recall that letter of June 29th?

"A Yes, sir, I do.

"Q What had influenced you to have that letter written?

"A Well, I was almost desperate. I was driving around those yards and all over them, and I was at a gas tank there one day and the former owner of the ranch, Mr. Steiner, one of our neighbors, was interested to see how it was looking, and he came up driving out of the fifty-five or fifty-six acre Fuggle yard, and he said, 'How come you aren't irrigating?' and I said, 'I can't,' and I said, 'What will my loss be,' and he said, 'You will lose it all.'

"Q At that time was the burn all over or in spots?

"A It was all over.

"Q Were there any cracks in the ground?

"A No, —oh, there may have been a leak in the main lines.

"Q Wouldn't that crack ——

"A (interrupting) It would make a mud hole anywhere.

"Q And did you cultivate constantly?

"A Yes, we did, day and night.

"Q What was the situation in hop growing silts?

"A Well, it is pertinent that you run your water in various amounts you need to try to get the amount of moisture you have to have. We will

irrigate now three or four-hourly set ups in different types of soil, but at that particular time it took four, six-hours to get that ground wet.

"Q Was Mr. Moritz critical?
"A Yes, he was very critical.

"Q There was no trouble getting water out of the wells?
"A The wells were good. We didn't have any difficulty with the wells ourselves.

"Q But it was getting equipment to use the water?
"A Yes.

"Q Did you try to buy equipment of your own?
"A Yes, I did.

"Q And what about these pumps that you paid Mr. Moritz for, the electrical pump?
"A That was the latter part of the season, and we had quite a lot of trouble, and he let us use this electric pump on a rent basis per hour, and we paid our electric bill for it, but it was getting toward the last part of the season, and that was our last irrigation.

"Q Did you have any other alternative?
"A No, sir."

N. Sanden, as a witness for the defendants, testified as follows:

"Q All right. You are acquainted with Jim and Helen Hanks, aren't you?
"A Yes.

"Q And have been for sometime?
"A Yes.

"Q Do you recall when they were operating the Golden Gate Hop Ranch?
"A Yes.

"Q Did you make periodic visits down there?
"A Yes.

"Q How often?

"A Oh, every week or two. I do a lot of scouting around.

"Q And were you operating a ranch at that time?

"A Yes.

"Q And what type of a year was that?

"A Very dry.

"Q Much more so than ordinary?

"A That's right. It was one of the toughest ones we have had for moisture.

"Q Did you have a chance to observe these hops, both the Fuggles and late hops on Mr. Hanks' place?

"A Oh, yes.

"Q Describe what you saw.

"A I gave him heck about them. I would have watered them if they had been mine. They was all burned up. Fruit buds all fell off of them, no hops, just a bare crop is all.

"Q Now, Mr. Sanden, what happens when the hop vine doesn't get water, that is, the lower part?

"A Well, if you don't give the hop vine water, the fruit falls off and you just get arms and you get just a few clumps on top.

"Q And was that true generally of his ranch?

"A Yes, that is right.

"Q Would you say that those hops didn't have sufficient irrigation?

"A That's right.

"Q Now, what about the red spider? Will water help that?

"A Yes, it does.

"Q In what way?

"A Well, it works in this way: It works the same way as, say, a sheep, for instance. You take a plant—it has got to have water in order to grow. That is the only way it gets its food is through

the water, and if it don't get the water, why, it becomes weak and a spider will attack it. Just like, you might say, an animal, a sheep, a fat lamb. Ticks don't bother it. Take a poor one that is out, the ticks will attack it and pretty near kill it. It is the same with the hop vines.''

The testimony of Herman Moritz, a witness for plaintiff, would indicate that defendants had treated the breach of covenant respecting the irrigation equipment as a constructive eviction, because they commenced moving their own machinery and equipment off the leased premises long before Moritz and his wife sold to the plaintiff. According to the defendant James Hanks, defendants had moved a large portion of their machinery and equipment by the end of hop-picking operations in early September, 1951, and all of it by the end of September, 1951. Defendants did not move out of the house in which they were living until early in January, 1952, but their use of this house was under a separate oral rental agreement, and was not a part of their original leasing contract. As to the removal of defendants' own machinery and equipment from the leased hop ranch, Herman Moritz, on direct examination, testified as follows:

"Q It was my understanding from your previous testimony that Mr. and Mrs. Hanks did not notify you when they abandoned the property?

"A No, sir, they didn't.

"Q Do you know approximately when they moved away from the Golden Gate Ranch?

"A *Well, they had started moving the equipment off months before.* As soon as he bought a new caterpillar tractor and brought it out there, Mr. Hanks used it and moved it off, and every now and then they would come in and say—there would be a load of machinery going out—'They were taking it out to be repaired,' and wouldn't bring it

back. They moved it out in January, but the equipment kept going, and we suspected.

"Q Was that January, 1952?

"A Yes, sir.

"Q Do you know what time of the month, the middle or first or latter part?

"A *I couldn't say the day he left. But he was hauling stuff out all the time for several months, and I don't know what day he left.* They weren't there a lot of the time. During the cultivation period there was a period for pretty near three weeks they weren't around the place hardly at all." (Italics ours.)

It is our opinion that if credence is given the above testimony, it was permissible for the jury to conclude that defendants had reasonable grounds to expect that this very serious difficulty as to the irrigation equipment would continue to exist throughout the term of the lease, and that they were thereby deprived of the free enjoyment of the premises in accordance with the specific terms of the lease. It is, therefore, our opinion, whether or not there was any evidence to show a surrender, that there was sufficient substantial evidence to support a verdict upon the theory of constructive eviction, and that a verdict in favor of defendants was compatible with the testimony.

In *Banfield et al. v. Crispen et al.,* 111 Or 388, 391, 226 P 235, we said:

"* * *, yet unless the party complaining here can point out that the verdict returned by the jury and adopted by the trial court in the rendition of its judgment was incompatible with the testimony and can thus put a finger on the actual error, the judgment cannot be overturned."

In the instant case plaintiff has not met this burden.

Plaintiff's third assignment of error is that the court erred in refusing to give the following requested instruction:

"I instruct you that a lessee cannot relieve himself from liability for rent to accure under an executed lease for a definite term by the abandonment of possession thereof, before the expiration of the term of the lease, without consent of the landlord; that is to say, the mere abandonment of the premises by the defendants HANKS would not have the effect of terminating the lease in this case, or any of its obligations, unless the landlord has given his consent thereto, either expressly or by clear implication."

It is our opinion that the court's instructions adequately covered the theory of surrender. Instructions given must be considered as a whole. Furthermore, the proposed instruction is misleading in this case because a lessee can relieve himself by "mere abandonment" without express or implied consent of the lessor if the lessor has done an act which amounts to the constructive eviction of the lessee. The proposed instruction contained no such qualification. That this is the generally accepted law is shown by 32 Am Jur 231, Landlord and Tenant § 246, wherein it is stated:

"* * * It is now well established that any disturbance of the tenant's possession by the landlord, or someone acting under his authority, which renders the premises unfit for occupancy for the purposes for which they were demised or which deprives the tenant of the beneficial enjoyment of the premises, causing him to abandon them, amounts to a constructive eviction, provided the tenant abandons the premises within a reasonable time."

Plaintiff's fourth assignment of error is that the court erred in instructing the jury on the law of con-

structive eviction. As shown above, there were sufficient allegations in the answer and substantial evidence in the record to support a verdict for the defendants upon the theory of constructive eviction; therefore, the court did not err in giving this instruction. We find no reversible error.

The judgment is affirmed.